UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

VICKI L. LAFRENIERE,

                     Plaintiff,

             V.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                   Defendant.

_____

                            **REPORT AND**
                        **RECOMMENDATION**

                            09-CV-167
                            (GTS/VEB)

## I. INTRODUCTION

In March of 2006, Plaintiff Vicki L. LaFreniere applied for supplemental security income ("SSI") benefits under the Social Security Act.  Plaintiff alleges that she is unable to work due to a variety of physical and mental impairments. The Commissioner of Social Security denied Plaintiff's application.

Plaintiff, through her attorneys, Conboy McKay Bachman & Kendall, LLP, Lawrence D. Hasseler, Esq., of counsel, commenced this action on February 13, 2009, by filing a Complaint in the United States District Court for the Northern District of New York. (Docket No. 1).  Plaintiff seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405 (g) and 1383 (c)(3).

On May 10, 2010, the Honorable Norman A. Mordue, Chief United States District Judge, referred this case to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket No. 16).

## II. BACKGROUND

The relevant procedural history may be summarized as follows: Plaintiff applied for SSI benefits on March 20, 2006. (T at 43).[1] The application was denied initially. (T at 30). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").  A hearing was held on June 26, 2008, before ALJ Joseph G. Medicis, Jr. by videoconference between Syracuse and Canton, New York. (T at 308-342).  Plaintiff appeared with an attorney, Molly Clough, Esq. (T at 308).

On September 9, 2008, the ALJ issued a decision denying Plaintiff's application. (T at 12-22).  Plaintiff filed a timely request for review by the Appeals Council. The ALJ's decision became the Commissioner's final decision on December 12, 2008, when the Appeals Council denied Plaintiff's request.  (T at 5-8).

Plaintiff, through counsel, commenced this action on February 13, 2009. (Docket No. 1).  The Commissioner interposed an Answer on May 13, 2009. (Docket No. 7).  Plaintiff filed a supporting Brief on May 18, 2009. (Docket No. 9).  The Commissioner filed a Brief in opposition on August 3, 2009. (Docket No. 21).

Pursuant to General Order No. 18, issued by the Chief District Judge of the Northern District of New York on September 12, 2003, this Court will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings.[2]

For the reasons that follow, it is respectfully recommended that the Commissioner's

---

[1]Citations to "T" refer to the Administrative Transcript.  (Docket No. 6).

[2]General Order No. 18 provides, in pertinent part, that "[t]he Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings."

motion be denied, Plaintiff's motion be granted, and this case be remanded to the Commissioner for further proceedings.

## III. DISCUSSION

### A.    Legal Standard

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); see Grey v. Heckler, 721 F.2d 41, 46 (2d Cir.1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir.1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir.1982).

If supported by substantial evidence, the Commissioner's finding must be sustained

3

"even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir.1984).

The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act. See 20 C.F.R. §§ 416.920, 404.1520. The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.[3]

---

[3]This five-step process is detailed as follows:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.

If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.

If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step. See Bowen, 482 U.S. at 146 n. 5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir.1984).

The final step of the inquiry is, in turn, divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering his or her physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(g); 404.1520(g); Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).

**B.    Analysis**

**1.    Commissioner's Decision**

The ALJ found that Plaintiff had not engaged in substantial gainful activity since March 10, 2006, the alleged onset date. (T at 14).  The ALJ concluded that Plaintiff had the following medically determinable impairments considered "severe" under the Act: reflex sympathetic dystrophy (right arm), post-traumatic stress disorder, anxiety disorder, and a dysthymic disorder. (T at 17). However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments found in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listings"). (T at 18).

The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work. (T at 18).  He found that Plaintiff has no past relevant work. (T at 21). Considering Plaintiff's age (44 years old on the date the application was filed), education

---

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir.1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir.1999); 20 C.F.R. §§ 416.920, 404.1520.

(at least high school), and RFC, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (T at 22). Accordingly, the ALJ found that Plaintiff was not under a disability, as that term is defined under the Social Security Act, since the alleged onset date. (T at 22).  As noted above, the ALJ's decision became the Commissioner's final decision on December 12, 2008, when the Appeals Council denied Plaintiff's request.  (T at 5-8).

### 2.    Plaintiff's Claims

Plaintiff contends that the Commissioner's decision should be reversed.  She offers five (5) principal arguments in support of her position.  First, Plaintiff contends that the ALJ failed to properly weigh the medical opinions.  Second, Plaintiff argues that the ALJ did not follow the steps required by the "special technique" when considering the extent and impact of her mental impairments.  Third, Plaintiff asserts that the ALJ failed to properly assess her RFC.  Fourth, Plaintiff argues that the ALJ improperly discounted her credibility.  Fifth, Plaintiff contends that the ALJ's finding that there is significant work in the national economy that she can perform is not supported by substantial evidence.  Each argument will be addressed in turn.

### a.    Failure to Properly Weigh Medical Opinions

The ALJ is obligated to consider all medical opinions.  20 C.F.R. § 416.927 (b) & (d); see also SSR 96-2p, 96-5p.  In this case, Plaintiff argues that the ALJ did not properly weigh the medical opinions of Dr. Williams (a consultative examiner), Ms. Taulbee (a treating social worker), Dr. Petro (a State Agency Review psychologist); and Lynn Roeder (a State Agency Review consultant).

6

### i.    Dr. Williams

Richard Williams, Ph.D. performed a consultative psychological evaluation on May 22, 2006. (T at 223).  Dr. Williams gave Plaintiff a Global Assessment Functioning ("GAF") score of 50. (T at 224).  "A GAF range of 41-50 indicates that the individual has a 'serious impairment in one of the following: social, occupational, or school functioning.'" Pollard v. Halter, 377 F.3d 183, 186 n.1 (2d Cir. 2004).  Dr. Williams also opined that Plaintiff "may not be able to handle her funds because of her confusion, memory problems, and dissociation." (T at 225).  He characterized Plaintiff's prognosis as "guarded" and concluded that she would "need continued mental health treatment." (T at 225).  Dr. Williams described Plaintiff as suffering from constant anxiety, flashbacks, nightmares, difficulties relating to others, and occasional confusion and "derealization." (T at 225).

Although the ALJ found "some support in the record" for this assessment, the ALJ discounted Dr. Williams's findings because he only saw Plaintiff once, never treated her, and offered his opinion without reviewing any of Plaintiff's medical records. (T at 21).

### ii.    Ms. Taulbee

Jill Taulbee, MSW, Plaintiff's treating therapist, completed a Medical Source Statement of Ability to Do Work-Related Activities (Medical) on June 26, 2008. (T at 287-89).   Ms. Taulbee opined that Plaintiff had marked limitations as to her ability to understand, remember, and carry out simple instructions. (T at 287).  She indicated that Plaintiff had moderate limitations with regard to the ability to make judgments on simple work-related decisions, and extreme limitations concerning her ability to understand, remember, and carry out complex instructions and make judgments on complex work-

related decisions. (T at 287).  Ms. Taulbee indicated that Plaintiff had moderate limitations in terms of interacting appropriately with the public and with supervisors; marked limitations with respect to interacting appropriately with co-workers; and extreme limitations as to responding to usual work situations and changes in a routine work setting. (T at 288).

The ALJ found that he could not "give much evidentiary weight" to Ms. Taulbee's assessment, on the grounds that, as a social worker, she was not a recognized medical source.  (T at 21).  In addition, the ALJ found Ms. Taulbee's findings to be "excessive and exaggerated, if not embellished." (T at 21).

### iii.    Dr. Petro

Rita S. Petro, Psy.D., a State Agency review psychologist, reviewed the medical records and completed a Mental Residual Functional Capacity Assessment on June 1, 2006.  Dr. Petro opined that Plaintiff was not significantly limited as to her ability to remember locations and work-like procedures and understand/remember very short and simple instructions; and was moderately limited in terms of understanding and remembering detailed instructions. (T at 236).  Dr. Petro assessed that Plaintiff was moderately limited as to carrying out detailed instructions, but had no significant limitations with respect to carrying out very short and simple instructions; maintaining attention and concentration for extended periods; performing regular activities within a schedule; sustaining an ordinary routine without special supervision; making simple work-related decisions; and working in close proximity to others without being distracted. (T at 236).

Dr. Petro also found that Plaintiff's ability to sustain concentration and persistence was moderately limited, but she found no significant limitation as to social interaction and adaption skills. (T at 237).  In sum, Dr. Petro concluded that "despite a psychiatric

8

impairment, [Plaintiff] is able to understand, remember, and carry out simple instructions, sustain a reasonable pace, relate and respond in a socially appropriate manner, make simple decisions and adapt to change." (T at 238).

The ALJ found that Dr. Petro's assessment was "well supported by the medical record" and therefore decided to adopt it in support of his decision. (T at 18).

### iv.   Dr. Roeder

On May 31, 2006, Lynn Roeder, a State Agency review consultant, completed a Physical Residual Functional Capacity Assessment form.  Ms. Roeder opined that Plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk/sit for about 6 hours in an 8-hour work day; push/pull in unlimited amounts; and had no postural, manipulative, visual, communicative, or environmental limitations. (T at 231-33). The ALJ referenced these findings in support of his decision. (T at 19).

### v.   Analysis

For the following reasons, this Court finds that the ALJ's consideration of the foregoing opinions was flawed.  In particular, the ALJ mischaracterized Dr. Williams's assessment and failed to give it sufficient weight; failed to adequately explain his reasons for dismissing the assessment of Ms. Taulbee; and gave too much weight to the assessments of the non-examining review consultants.

In support of his findings, the ALJ indicated that Dr. Williams, the consultative psychiatric examiner, "did not find that [Plaintiff] had any mental limitations." (T at 19).  This is true only if by "mental limitations," one means the four areas of limitations used by the Commissioner in evaluating the severity of a claimant's mental impairments (*i.e.* (1)

9

activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation).  See 20 C.F.R. § 404.1520a(c)(3).  It is correct that Dr. Williams did not specifically reference these areas in his assessment and thus did not make any particular findings (*one way or the other*) as to whether or to what extent Plaintiff was limited in any of these areas.

However, the ALJ's statement would lead one to believe that Dr. Williams concluded that Plaintiff had no mental limitations and, thus, that his assessment supported the ALJ's overall conclusion.  This is simply not the case.  Rather, Dr. Williams found that Plaintiff "has chronic symptoms of depression and posttraumatic stress disorder." (T at 225).  He assessed her prognosis as "guarded," recommended continued mental health treatment, and indicated that Plaintiff likely could not handle her own funds. (T at 225).

Most significantly, Dr. Williams gave Plaintiff a GAF score of 50.  (T at 224).  The GAF "ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. " Pollard, 377 F.3d at 186.  As noted above, a GAF score of 50 indicates a serious impairment in the level of mental functioning.  See Hall v. Astrue, 677 F. Supp.2d 617, 622 n.3 (W.D.N.Y. 2009)("A GAF score of 50 or lower suggests a 'serious impairment' in the level of functioning.")(quoting Garcia v. Commissioner of Social Security, 496 F.Supp.2d 235, 238 (E.D.N.Y.2007)).   Thus, the GAF score assigned by the consultative psychiatric examiner was an important indicator of the extent of Plaintiff's mental limitations.   Nevertheless, the ALJ made no mention of the GAF score in his decision.

This Court is mindful of the ALJ's observation that Dr. Williams did not review any medical records and, as such, Dr. Williams's findings may have been based in large

measure on subjective complaints.  However, the Second Circuit has held that a patient's complaints or reports of her history are "an essential diagnostic tool." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir.2008) (quoting Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir.2003)) (referring to "a patient's report of complaints, or history, as an essential diagnostic tool.").  Moreover, the ALJ did not adequately take into account the fact that Dr. Williams's assessment, although not based on a review of Plaintiff's medical records, was nevertheless consistent with the findings of her treating therapist.

For example, in a report prepared by Ms. Taulbee under the supervision of Amber Davis, LCSW-R and reviewed by Dr. John Beamer, Ph.D., M.D., Plaintiff was assigned a GAF score of 50. (T at 284).  Ms. Taulbee also described witnessing Plaintiff suffering from a panic attack in the hallway of the clinic. (T at 283).  She further opined that Plaintiff was "not doing well and appear[ed] desperate for help." (T at 283).  Treatment notes indicate that Plaintiff was referred to Ms. Taulbee for mental health treatment after suffering a "severe panic attack" that required emergency room treatment. (T at 290).

The ALJ largely dismissed Ms. Taulbee's findings because, as a social worker, she cannot give a medical opinion.  In this limited respect, the ALJ is correct - a social worker's opinion is not considered a "medical opinion."  See Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir.1995); Corson v. Astrue, 601 F. Supp.2d 515, 531-32 (W.D.N.Y. 2009).  The Social Security Regulations provide that "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of ... impairment(s)...." Diaz, 59 F.3d at 313 (citing 20 C.F.R. § 404.1527(a)(2)). Section 404.1513(a) lists five categories of "acceptable medical sources,"

11

none of which mentions therapists or social workers. Rather, therapists and social welfare agency personnel are expressly listed in a separate section, under "other sources" whose "[i]nformation ... may ... help us to understand how [the] impairment affects your ability to work." Id. (citing 20 C.F.R. § 404.1513(e) (1994)).

However, with that said, the ALJ was not free to simply disregard the social worker's assessment on that basis alone.  While opinions from therapists and social workers are not considered "acceptable medical sources," such opinions are nevertheless "important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006); see also White v. Comm'r, 302 F.Supp.2d 170, 174-76 (W.D.N.Y.2004) (reversing where the ALJ failed to give appropriate weight to the plaintiff's social worker, who had a regular treatment relationship with the plaintiff and whose diagnosis was consistent with the treating psychiatrist); Pogozelski v. Barnhart, No. 03-CV-2914, 2004 WL 1146059, at *12 (E.D.N.Y. May 19, 2004) (finding that "some weight should still have been accorded to [the therapist's] opinion based on his familiarity and treating relationship with the claimant"); Allen v. Astrue, 05-CV-0101, 2008 WL 660510, at *9 (N.D.N.Y. Mar.10, 2008) (remanding because ALJ did not evaluate the treating therapist's opinion); Bergman v. Sullivan, No. 88-CV-513, 1989 WL 280264, *3 (W.D.N.Y. Aug. 7, 1989) (holding that treating social worker is "a non-medical source whose opinion concerning the nature and degree of plaintiff's impairment is not only helpful, but critically important, since he is the only treating source").

Indeed, "[b]ased on the particular facts of a case, such as length of treatment, it may be appropriate for an ALJ to give more weight to a non-acceptable medical source than a treating physician." Anderson v. Astrue, No. 07-CV-4969, 2009 WL 2824584, at *9

(E.D.N.Y. Aug, 28, 2009).

This Court is mindful of the fact that the Second Circuit has stated that "the ALJ has discretion to determine the appropriate weight to accord the [other source's] opinion based on all the evidence before him."  Diaz v. Shalala, 59 F.3d 307, 313-14 (2d Cir.1995). However, it was an abuse of that discretion for the ALJ in this case to reject the social worker's assessment out of hand.  The ALJ summarily cast aside the severe impairments assessed by Ms. Taulbee by noting that she is not an acceptable medical source and by stating, without further explanation, that her assessments were "excessive and exaggerated, if not embellished."  (T at 21).  The ALJ's reference to embellishment infers a deliberate overstatement of the limitations by the treating therapist/social worker.  The ALJ offers no evidence or explanation in support of what appears to be his opinion that such an overstatement occurred, an opinion utterly without foundation.

While the ALJ was not bound to give Ms. Taulbee's assessment any particular weight, he was obligated to explain his decision, and his conclusory assertions are insufficient to meet that obligation. See Canales v. Commissioner of Social Sec., No. 08-CV-5019, 2010 WL 1140861, at *8 (E.D.N.Y. Mar. 26, 2010)("While the ALJ was free to conclude that the opinion of a licensed social worker was not entitled to any weight, the ALJ had to explain that decision."); see also Gillies v. Astrue, No. 07-CV-517, 2009 WL 1161500, at *6 (W.D.N.Y. Apr. 29, 2009) (vacating and remanding where ALJ rejected opinion of nurse practitioner solely because "nurse practitioners are not necessarily considered to be acceptable sources of medical evidence") (internal citations omitted).

In addition, the ALJ should have considered the fact that the assessments of Dr. Williams and Ms. Taulbee were consistent with each other - indeed, both gave Plaintiff a

13

GAF score of 50, the result of an objective test.  This consistency should have been considered and discussed, as it tends to lend greater credence to the findings of both the consultative examiner and the treating therapist/social worker.  Instead, the ALJ bypassed the matter completely.

The ALJ's findings regarding Plaintiff's mental limitations were based upon the assessment of Dr. Petro, a State Agency review consultant and the ALJ's assessment of Plaintiff's credibility and treating history.  For the reasons stated below, the ALJ's credibility assessment was flawed. For example, his conclusion that Plaintiff was "evasive" about her marijuana use is not supported and, indeed, is contradicted by the hearing transcript. Likewise, the ALJ appears to have given undue weight to his own lay observations concerning Plaintiff's level of pain during the hearing.

Moreover, the ALJ's heavy reliance upon the State Agency review consultant's assessment, especially in light of the ALJ's failure to give proper consideration to the findings of the consultative examiner and treating therapist/social worker was likewise an error.  While the findings of non-examining analysts can, and often do, provide valuable supplemental support for an ALJ's decision, they should generally be afforded relatively little weight in the overall disability determination.  See Vargas v. Sullivan, 898 F.2d 293, 295-96 (2d Cir.1990) ("The general rule is that ... reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant."); see also Yoxall v. Apfel, No. 99-CV-656, 2001 WL 539608, at *11 (D.Conn. Mar. 30, 2001)(collecting cases and noting that a "non-examining physician's opinion . . . is afforded less weight than a treating or

examining-consulting physician's opinion in the evaluation of the claimant's disability"). Moreover, it is noteworthy that the ALJ was quick to dismiss Dr. Williams's assessment because he "only saw the claimant once," but then readily accepted the findings of State Agency review analysts who never examined Plaintiff at all.  See Shaw v. Chater, 221 F.3d 126, 135 (2d Cir.2000) ("This 'pick and choose' approach to reviewing the evidence undermines the court's confidence in the ALJ's determination.").

For the foregoing reasons, this Court finds that a remand is necessary for the Commissioner to reconsider the evidence and re-weigh the applicable medical evidence in accordance with the applicable laws and regulations.  In particular, the Commissioner should consider the extent to which the consistency between the assessments of Dr. Williams and Ms. Taulbee indicate that those assessments should be afforded greater weight.  Particular attention should be paid to the GAF score assigned by both consultants. Further, to the extent that the Commissioner believes Dr. Williams's assessment is unclear regarding the extent of Plaintiff's mental limitations, Dr. Williams should be re-contacted.

### b.    Improper Application of Special Technique

When evaluating the severity of mental impairments, the regulations require the ALJ to apply a "special technique" at the second and third steps of the review, in addition to the customary sequential analysis. Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir.2008) (citing 20 C.F.R. § 404.1520a).

The technique first requires a determination of whether the Plaintiff has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Then, the ALJ must rate the degree of Plaintiff's functional limitation resulting from the impairment in four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and

15

(4) episodes of decompensation. <u>See</u> 20 C.F.R. § 404.1520a(c)(3).

These areas are rated on a scale of "none, mild, moderate, marked, and extreme." 20 C.F.R. §§ 404.1520a(c)(4); 416 .920a(c)(4).  A mental impairment is generally found not severe if the degree of limitation in the first three areas is mild or better and there are no episodes of decompensation. § 404.1520a(d)(1). The ALJ must document "a specific finding as to the degree of limitation in each of the functional areas." 20 C.F.R. § 404.1520a(e)(2).  If the mental impairment is found to be severe, at the third step of the review, the ALJ must consider whether the claimant's mental impairments meet or medically equal one of the listed impairments.  If the impairments do meet or medically equal one of the impairments set forth in the Listings, the claimant will be found to be disabled. If not, the ALJ is then required to assess the claimant's residual mental functional capacity. § 404.1520a(d)(3).

In this case, the ALJ found that Plaintiff had severe mental impairments. (T at 14). However, he concluded that Plaintiff's mental impairments did not meet or medically equal any of the impairments set forth in the Listings, giving particular consideration to the impairments at § 12.04 (Affective Disorders) and § 12.06 (Anxiety Related Disorders) of the Listings. (T at 18).

To establish that his or her impairments meet or equal the impairments listed in either of those sections of the Listings, a claimant must first satisfy one of the threshold criteria set forth in Subsection (A) of the impairment descriptions.  This typically involves proof of a medically determined mental impairment, combined with evidence of some definite limitation caused by that impairment.

If the claimant falls within the threshold parameters of Subsection (A), the inquiry

16

turns to Subsection (B) of § 12.04 and § 12.06 to determine whether the claimant's "mental impairments result in at least two of the following: (1) marked restrictions in activities of daily living; (2) marked restrictions in social functioning; (3) marked restrictions in maintaining concentration, persistence, or pace; (4) repeated episodes of decompensation, each of extended duration." Paratore v. Comm'r of Social Security Admin., No. 05-CV-1356, 2008 WL 541156, at *5 (N.D.N.Y. Feb. 25, 2008).

In this case, the ALJ found that Plaintiff did suffer from mentally determinable mental impairments (post-traumatic stress disorder, anxiety disorder, dysthymic disorder). (T at 14). The ALJ further determined that the impairments were severe. (T at 14). Thus, the key inquiry is the effect Plaintiff's impairments had with regard to the Subsection (B) criteria. A claimant will only be disabled if his or her impairment(s) results in marked restrictions in at least two of the specified areas, sufficient to preclude the claimant from performing basic work activities. See Armstrong v. Comm 'r of Social Sec., No. 05-CV-1285, 2008 WL 2224943, at * 12 (N.D.N.Y. May 27, 2008) (holding that even if the ALJ had determined that the plaintiff's depression was a medically determinable impairment, substantial evidence must exist to support a conclusion that the condition was severe and precluded the plaintiff from doing basic work activities).

The ALJ concluded that Plaintiff had only mild impairment in daily living activities, moderate limitation with respect to social functioning, moderate limitation as to maintaining concentration, persistence, or pace, and no episodes of deterioration of extended duration. (T at 18). The ALJ's conclusion in this regard suffers from the flaws identified above. The ALJ adopted the findings of Dr. Petro, a non-examining State Agency review consultant, upon the conclusion that those findings were "well supported by the medical record . . . ."

17

(T at 18).  However, the ALJ's review of the medical record was flawed for the reasons outlined in this Report & Recommendation.  Specifically, the ALJ mischaracterized the consultative examiner's report (by suggesting, for example, that consultative examiner did not find "any mental limitations"), failed to give an adequate explanation for dismissing the assessment of Plaintiff's treating therapist/social worker, afforded too much weight to the findings of non-examining consultants, and improperly discounted Plaintiff's credibility. Thus, the special technique analysis should be revisited on remand after further consideration and development of the record as outlined herein.

### c.    Residual Functional Capacity

Residual functional capacity ("RFC") is defined as: "what an individual can still do despite his or her limitations." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir.1999).  "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Id.

When making a residual functional capacity determination, the ALJ considers a claimant's physical abilities, mental abilities, symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a).  An RFC finding will be upheld when there is substantial evidence in the record to support each requirement listed in the regulations. LaPorta v. Bowen, 737 F.Supp. 180, 183 (N.D.N.Y.1990).

In this case, the ALJ found that Plaintiff had the RFC to perform "light work," as defined in 20 C.F.R. § 416.967 (b).  Plaintiff challenges this determination on the grounds

18

that the ALJ improperly discounted Plaintiff's credibility and failed to give due consideration to her allegations of breast pain.  For the reasons discussed below, this Court finds that the ALJ did not properly evaluate Plaintiff's credibility.  In addition, the ALJ's consideration of Plaintiff's breast pain was tainted by error.

The medical records document that Plaintiff received treatment for chronic bilateral breast pain and swelling, which treatment included multiple breast biopsies. (T at 220). Seth P. Harlow, M.D., of the Breast Care Center in Burlington, Vermont, noted that Plaintiff had a history of "atypical duct hyperplasia with some fibrocystic changes." (T at 221).  He recommended treatment with primrose oil, noting that some patients with fibrocystic changes and breast pain have improvement on this regimen.  (T at 221).  At the hearing, Plaintiff testified that her breasts enlarge to the point where she cannot move her arms. (T at 339-40).  The breast engorgement and related pain last "for weeks." (T at 340).  Plaintiff described the sensation as "extremely painful" and indicated that it prevents her from wearing a bra. (T at 340).

The ALJ dismissed Plaintiff's testimony, noting that Plaintiff's breast disease was "benign" and concluding that "the record does not show that the alleged symptoms have presented more than a minimal adverse effect on her ability to engage in work activity." (T at 17-18).  This finding is problematic in at least two respects.

First, the ALJ appears to conflate "benign" (*i.e.* non-cancerous) with non-painful. There is nothing in the record to suggest that atypical duct hyperplasia with fibrocystic changes does not or cannot cause the sort of pain and swelling that Plaintiff alleges.  As such, the fact that the condition is non-cancerous seems to be irrelevant as to the issue of whether it is painful and thus disabling.  Indeed, as noted above, Dr. Harlow of the Breast

19

Care Center prescribed primrose oil treatment for pain relief related to Plaintiff's condition. (T at 221).  The ALJ appears to have assumed that Plaintiff's condition could not cause the pain alleged because it was non-cancerous.  This finding is not supported by substantial evidence.

Second, the Second Circuit has held that the severity analysis at step two of the sequential evaluation process is limited to "screen[ing] out de minimis claims," Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir.1995).  A finding of "not severe" is appropriate "if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, No. 97-CV-5759, 1999 WL 294727 at *5 (E.D.N.Y. March 19,1999) (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n. 12 (1987)).

The pain and swelling as described by Plaintiff could certainly have more than a minimal effect on her ability to work.  For the reasons discussed below, the ALJ discounted Plaintiff's testimony and did not properly assess her credibility.  Indeed, it appears that his "non-severe" finding with respect to Plaintiff's breast pain was based primarily on his discounting of her subjective complaints.  The medical records document frequent complaints of breast pain and treatment (including multiple surgeries) for issues related to Plaintiff's breasts.  On remand, this issue should be revisited in connection with a reexamination of Plaintiff's credibility, with further consideration given to the medical evidence, including Dr. Harlow's findings.

### d.    Credibility

Courts in the Second Circuit have determined pain is an important element in SSI claims and pain evidence must be thoroughly considered. See Ber v. Celebrezze, 333 F.2d

20

923 (2d Cir.1994). If an ALJ rejects a claimant's testimony of pain and limitations, he or she must be explicit in the reasons for rejecting the testimony. See Brandon v. Bowen, 666 F.Supp. 604, 609 (S.D.N.Y.1997).

To this end, the ALJ must follow a two-step process to evaluate the plaintiff's contention of pain, set forth in SSR 96-7p:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) ... that could reasonably be expected to produce the individual's pain or other symptoms ....

> Second, ... the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities ....

According to 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii), if the plaintiff's pain contentions are not supported by objective medical evidence, the ALJ must consider the following factors in order to make a determination regarding the plaintiff's credibility:

1.  [Plaintiff's] daily activities;
2.  The location, duration, frequency and intensity of [Plaintiff's] pain or other symptoms;
3.  Precipitating and aggravating factors;
4.  The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate ... pain or other symptoms;
5.  Treatment, other than medication [Plaintiff] receive[s] or ha[s] received for relief of ... pain or other symptoms;
6.  Any measure [Plaintiff] use[s] or ha[s] used to relieve ... pain or other symptoms;
7.  Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

If the ALJ finds that the plaintiff's pain contentions are not credible, he or she must state his reasons "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." Young v. Astrue, No.

21

7:05-CV-1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting Brandon v. Bowen, 666 F.Supp 604, 608 (S.D.N.Y.1987)).

In this case, Plaintiff testified that she experiences constant pain, with muscle spasms in her hips and buttocks.  (T at 327).  She suffers from severe headaches that force her to stop most activity and avoid light and food for up to three days. (T at 327). Plaintiff stated that she is afraid to leave the home. (T at 328).  She testified that she cannot pick up objects with her left arm and that her hand is extremely sensitive to touch. (T at 329-330).  Plaintiff also testified to disabling pain in her right arm. (T at 331).  She must change positions about every ten minutes when sitting. (T at 336).  Plaintiff stated that she does very little housework.  (T at 336).  With regard to her mental impairments, Plaintiff testified that she was beaten and tortured as a child and now has a "profound fear of people." (T at 332).  She suffers from sleep problems, depression, and difficulty maintaining concentration. (T at 333).

The ALJ gave very little credence to Plaintiff's testimony, based primarily upon the fact that he found her "quite evasive in her response to questions." (T at 20).  This Court is mindful of the fact that the ALJ had the opportunity to view Plaintiff "in person" (albeit via videoconference), however, the transcript does not support the ALJ's assessment.  Rather, the transcript indicates that the ALJ was impatient and rushed, frequently asking compound questions and interrupting Plaintiff before she could finish her answers.  The questioning concerning Plaintiff's marijuana use provides a useful example.  The ALJ discounted Plaintiff's testimony, in part, because he found Plaintiff "evasive" about her use of "pot." (T at 20).  The pertinent exchange was as follows:

Q:      Okay.  But pot, I think I read somewhere that [*sic*] continues to be

22

some use.  Is that correct?

A:    Yes, I have used marijuana.

Q:    All right.  Do you continue to use it, and how often do you use marijuana or pot?

A:    Marijuana, that varies.  I don't have money to purchase it.  I normally use marijuana to sleep and to calm down my anxiety, but like I said, I don't have the money for it so it's been really hard for me to purchase it or get it.  I don't have money, sir.

Q:    Well, I'll - -

A:    And I have –

Q:    – repeat the question.  How often do you use pot or marijuana?  And so you understand what I'm looking –

A:    Right, I –

Q:    – for, it it –

A:    I would say –

Q:    – daily?

A:    – about three times a month, sir.

Q:    Is it once a week?  Is it three times month?  What is –

A:    Three times a month.

Q:    – what is the use now?

A:    Three times a month.

Q:    That's something – I had three times.

A:    Yeah.

Q:    That's something that I just happened to luckily then [*sic*] ?

A:    No, actually I said it before you said it.  You just didn't hear me, Your Honor.

23

(T at 325-26).

Thus, contrary to the ALJ's finding, Plaintiff was not evasive about her marijuana use.  She readily admitted using it, explained why she used it, and tried to tell the ALJ on more than one occasion exactly how often she used it.  Earlier in the hearing, the ALJ indicated that he was having some audio/video difficulties with the videoconference (T at 310), which may have caused him to mishear Plaintiff's response and/or to become frustrated.  Whatever the reasons for his apparent impatience, the hearing transcript suggests an argumentative and rather antagonistic attitude on the part of the ALJ.  In any event, the ALJ presumably had access to the transcript when drafting his decision and should have realized that (whatever his recollection) Plaintiff's testimony concerning her marijuana use was not evasive.

The ALJ also placed undue emphasis on the fact that Plaintiff had tattoos.  The ALJ noted that Plaintiff alleged that she was very sensitive to pain, but found this allegation undermined because she had a visible tattoo on her arm, testified to a tattoo on her back, and the record indicated that she has "many tattoos." (T at 20). Presumably, the ALJ meant to imply that obtaining a tattoo is painful and therefore inconsistent with Plaintiff's allegation of sensitivity to pain.   However, this connection is tenuous at best, given that the ALJ conducted very little questioning on this issue at the hearing (concerning, for example, how much pain Plaintiff experienced when obtaining the tattoos, when they were obtained, and whether the locations of the tattoos corresponded to the areas where Plaintiff experienced sensitivity) and what little questioning he conducted indicated that Plaintiff obtained a tattoo when she was fourteen years old, more than two decades before the alleged onset of disability.  (T at 338-339).

24

Regarding this issue, the ALJ also made the following statement in support of his decision to discount Plaintiff's credibility: "I mentioned that I had noted that she had several tattoos, but the claimant said she had only one that she got at age 14 *and some on her back*." (T at 20)(emphasis added)(which the ALJ failed to pinpoint as having been obtained during the relevant time period).  Here, the ALJ appears to be attempting again to offer evidence in support of his finding that Plaintiff was "evasive" in her answers.  Once again, his finding is not supported by the transcript.  The relevant exchange was as follows:

> Q:    So I'm just repeating what the doctor said.  You have multiple tattoos.
>
> A:    Right.
>
> Q:    Yes? No?
>
> A:    Yes, sir.  I do.

(T at 339).  Thus, the transcript does not substantiate any suggestion of evasiveness on Plaintiff's part. Again, it is not entirely clear whether the ALJ's error in this regard resulted from technical problems, inattention, or some sort of personal offense taken by the ALJ to Plaintiff's appearance.  In any case, the ALJ's assessment is based upon factual findings not supported by the record and the issue of Plaintiff's credibility must therefore be revisited.

In regard to the above, this Court is mindful that "[i]t is the function of the [Commissioner], not [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Secretary of Health and Human Servs., 705 F.2d 638, 642 (2d Cir.1983) (citations omitted).  However, the ALJ's credibility determination is nevertheless subject to review to determine whether it is supported by substantial evidence.  This Court is not obliged to accept the ALJ's findings where, as here,

those findings are not supported by the record.

Lastly, the ALJ appears to have relied heavily on his lay observations of Plaintiff via videoconference during the hearing, noting that "although she alleged being very much in pain, she appeared to sit comfortably for 45 minutes at the hearing." (T at 20). The ALJ's "observation that [Plaintiff] sat through the hearing without apparent pain, being that of a lay person, is entitled to but limited weight." Carroll v. Secretary of Health and Human Services, 705 F.2d 638, 643 (2d Cir.1983); see also Schaal v. Apfel, 134 F.3d 496, 501-02 (2d Cir.1998) (finding that "in weighing the credibility of [claimant's] testimony as to . . . physical disability," ALJ's observation that the claimant "'did not appear to be in discomfort while sitting and there was no sign of breathing abnormalities' ... should be assigned only 'limited weight'") (citations omitted); Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir.1983) (holding that when ALJ "place[s] principal, if not sole, reliance upon his observations at the hearing," the ALJ's observations "are entitled to limited weight") (citation omitted); Soto v. Barnhart, 242 F.Supp. 2d 251, 257 (W.D.N.Y. 2003) ("Where it is well documented that the plaintiff has endured this pain for many years, and has as a result learned to tolerate such pain, I find it of very limited value that the ALJ observed no *apparent* signs of distress.")(emphasis in original).

Moreover, this Court has no way to determine the extent to which the ALJ was able to observe Plaintiff via videoconference. For example, was Plaintiff's entire body visible to the ALJ or did only her head appear on the video monitor? How clear was the resolution on the video feed? Thus, whatever limited evidentiary weight the ALJ's lay assessment might have been entitled to must be further discounted by the lack of information concerning the particulars of his opportunity for observation.

26

In light of all of the foregoing factors, this Court has little difficulty concluding that the ALJ's credibility assessment is not supported by substantial evidence and the entire issue of Plaintiff's subjective complaints needs to be revisited on remand.

### e.    Reliance upon the Grids

At step 5 in the sequential evaluation, the ALJ was required to perform a two part process to first assess Plaintiff's job qualifications by considering her physical ability, age, education, and work experience, and then determine whether jobs exist in the national economy that Plaintiff could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983). In this, and other social security cases, the second part of this process is generally satisfied by referring to the applicable rule of the Medical-Vocational Guidelines set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly called "the Grids" or the "Grid"). See Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir.1986).

The function of the Grids was succinctly summarized by the court in Zorilla v. Chater, 915 F.Supp. 662, 667 (S.D.N.Y.1996) as follows:

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

Id.

"The Grid classifies work into five categories based on the exertional requirements of the different jobs. Specifically, it divides work into sedentary, light, medium, heavy and

27

very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Id. at 667 n. 2; see 20 C.F.R. § 404.1567(a). Upon consideration of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled." 20 C.F.R. § 404.1569, § 404 Subpt. P, App. 2, 200.00(a).

In this case, the ALJ used the Grids as a framework for making his disability determination. (T at 22).   However, the ALJ's consultation of the Grids was based upon his RFC assessment with regard to Plaintiff's physical limitations, namely that she was capable of performing the full range of light work, and his finding that Plaintiff's mental limitations had little or no effect on her occupational base of light work.  (T at 22).  These determinations were necessarily impacted by the ALJ's errors as discussed above.  As such, the step 5 analysis should be revisited on remand following reconsideration of that portion of the ALJ's decision.

**3.    Remand**

"Sentence four of Section 405 (g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case for a rehearing.'" Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2002) (quoting 42 U.S.C. § 405 (g)).  Remand is "appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim." Kirkland v. Astrue, No. 06 CV 4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008).  Given the deficiencies in the record as outlined above, it is recommended that the case be remanded for further proceedings consistent with this Report and Recommendation.

28

### 4.      Assignment to a Different ALJ

This Court is mindful that courts in this Circuit typically refrain from directing the Commissioner to assign a different ALJ upon remand. See, e.g, Hartnett v. Apfel, 21 F. Supp.2d 217, 222 (E.D.N.Y.1998). However, in limited instances, it is appropriate to consider whether "a fresh look by another ALJ [upon remand] would be beneficial[.]" Vicari v. Astrue, 05 CV 4967, 2009 WL 331242, at *6 (E.D.N.Y. Feb. 10, 2009).

In such circumstances, courts, including the Second Circuit, have directed that a different ALJ be assigned on remand. See, e.g., Kolodnay v. Schweiker, 680 F.2d 878, 880-81 (2d Cir.1982); Maggipinto v. Astrue, 541 F.Supp.2d 477, 479-80 (D.Conn.2007); Hartnett v. Apfel, 21 F.Supp.2d 217, 223 (E.D.N.Y.1998); Sutherland v. Barnhart, 322 F.Supp.2d 282, 292 -293 (E.D.N.Y. 2004); Miles v. Chater, 84 F.3d 1397, 1400-01 (11th Cir.1996); Ventura v. Shalala, 55 F.3d 900, 904-05 (3d Cir.1995).

This Court believes that assignment to a different ALJ on remand is warranted in this particular case.  The hearing transcript and decision strongly suggest that the ALJ made a subjective assessment of the Plaintiff during the hearing and allowed that assessment to color his consideration of the medical evidence and, indeed, affect his recollection of the testimony.  A fresh look by another ALJ upon remand would clearly be beneficial and the Commissioner should be directed to make such an assignment on remand.


### IV. CONCLUSION

For the foregoing reasons, it is respectfully recommended that Plaintiff's motion for judgment on the pleadings be granted, Defendant's motion for judgment on the pleadings

be denied, the decision of the Commissioner be reversed, that the case be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405 (g) for further administrative proceedings consistent with this Report and Recommendation, and that the Commissioner be ordered to assign a different ALJ on remand.

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge

Dated:   July 27, 2010
            Syracuse, New York

## V. ORDERS

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as NDNY Local Rule 72.1(c).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE**

**OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE**

**DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.**

Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir.

1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C.

§636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY

Local Rule 72.1(c).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to

consider arguments, case law and/or evidentiary material *which could have been, but were*

*not*, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc.

v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

SO ORDERED.

July 27, 2010

Victor E. Bianchini
United States Magistrate Judge

31